**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**UNITED STATES OF AMERICA**

v.  Case No. 2:18-cr-58-FtM-38MRM

**SOLOMON WILLIAMS**
_____/

**SENTENCING MEMORANDUM**

Comes now, the defendant, Solomon Williams, by and through counsel, and hereby files this memorandum in support of a sentence sufficient but not greater than necessary to achieve the goals of sentencing.

In furtherance of that effort, Mr. Williams respectfully submits that a downward variance is warranted in this case. For the reasons presented in this memorandum and in the PSR, it is respectfully submitted that a sentence of sixty (60) months followed by a term of supervised release of no less than three years, is sufficient but not greater than necessary to achieve the goals of sentencing.

The realm of 18 U.S.C. § 3553(a) includes consideration of the defendant's life history. *See United States v. Battiest,* 553 F.3d 1132, 1136 (8th Cir. 2009) *cert. denied* 556 U.S. 1265 (2009). *Cf. Johnson v. Secretary, Florida Dept. of Corrections,* 643 F.3d 907, 932 (11th Cir. 2011).[1] As such, two exhibits are annexed hereto: a one-page letter, postmarked May 1, 2019, and authored Sebastian Williams, brother to Mr. Williams ("Exhibit A") and a six-page letter, dated May 22, 2019, and authored Gloria Brown Johnson, one of Mr. Williams's maternal aunts

---

[1] "No reasonable attorney, after being told by his client that he had an abusive upbringing, would fail to interview members of his client's family who were readily available and could corroborate or refute the allegations of abuse." *Johnson, supra.*

("Exhibit B").

A married, 28-year-old father of a one-year-old daughter, Zy'mir Williams, *see* PSR ¶¶ 51, 59, Mr. Williams begins with an acknowledgement: a cursory review of the Pre-Sentence Investigation Report would promote an all-too-expedient conclusion -- a life journey of just 28 years that includes six juvenile contacts with law-enforcement and a history of narcotics abuse unraveled and terminates in the convictions for the instant felony offenses. *See* PSR ¶¶ 39-44 (juvenile adjudications), 72 (heroin addiction).[2] The Court, however, must sentence ***this*** life journey and not ***a*** life journey.[3] While a "thorough presentence investigation ordinarily is essential in determining the facts relevant to sentencing,"[4] no PSR is required to contain every detail a party "feels has some relevance." *United States v. Palmer,* 761 F.Supp. 697, 699 (D. Idaho 1991). In this case -- and with this defendant -- the childhood experiences of Solomon Williams are so extraordinary and, at times, so vile and horrific, that the most exhaustive of pre-sentence investigations would almost certainly fail to encompass the complexity of life events leading to the events at bar. As such, this sentencing memorandum is respectfully submitted.

**1. The history and characteristics of Solomon Williams**

A. <u>Growing up drunk</u>

One year younger than Mr. Williams, Sebastian Williams tells us:

> They tryed [sic] to be the best of parent [sic] they knew how, but as little kids we were like sponges mimiking [sic] and doing every thing they did

---

[2] Addiction carries with it certain reasonably foreseeable consequences. *Hooks SuperX v. McLaughlin,* 642 N.E.2d 514, 517 (Ind. 1994); *see United States v. Hollins,* 847 F.3d 535, 538 (7th Cir. 2017) (addiction to crack cocaine predictably "led to a long string of criminal convictions involving incarceration, stints in various treatment centers, and home confinement"); *United States v. Martinez,* 588 F.3d 301, 323 (6th Cir. 2009) *cert. denied* 562 U.S. 1017 (2010) (misuse of prescribed substance is foreseeable result of addiction to that substance).

[3] To achieve the 18 U.S.C. § 3553(a) mandate for individualized sentencing, *United States v. McGee,* 736 F.3d 263, 272 (4th Cir. 2013) *cert. denied* 572 U.S. 1028 (2014) (*citing Gall v. United States,* 552 U.S. 38, 50 (2007), the Court may consider any relevant information in fashioning a sentence. *Pepper v. United States,* 562 U.S. 476, 509-510 (2011) (Breyer, J., concurring); *see also United States v. Merritt,* 988 F.2d 1298, 1313 (2nd Cir. 1993) (citing 18 U.S.C. § 3661 for proposition "that the court could, in any event, consider 'any relevant information'").

[4] Commentary Note, USSG § 6A1.1 (*Guidelines Manual*, November 2018).

because we thought it was the right thing to do, because that's all we were use [sic] to seeing. I remember Solomon and my sister would go in the refrigerator and drink my mother's liquor that she would leave in there, then our mother would get mad and beat us all.

Exhibit A at 1.

Mirroring the contaminated recollections of his brother, Mr. Williams advised Officer Stevens that "his mother drank hard liquor right of the bottle, used cocaine and was violent when drunk." *See* PSR ¶ 55. Gloria Johnson, Mr. Williams's aunt, paints the most unsparing portrait of her younger sister:

> If nothing else, I hope this timeline reflects that Marian was not an unfit mother to her children that she gave life too [sic], but reflects that she was not a mother at all. She never stopped long enough to care about anything outside of herself. I believe she loved them as much as she knew how to. I was not there, but I heard that law enforcement was a constant part of their lives in a very bad way. I cringe at the thought of the upbringing Brianna, Solomon and Sebastian endured. Their childhood memories were mostly haunted and the happy times seemed to have been short lived.

Exhibit B at 5.

Ultimately, neither of Mr. Williams's parents lived past 50.[5] *See* PSR ¶¶ 51, 52. As will be fully developed below, Mr. Williams's parents were "bad" parents in that they were not parents at all. Ms. Johnson writes at page 5 of Exhibit A: "We can become negative products of our environment if we don't have positive help. Some people make it out, and others don't."

Mr. Williams has four siblings. The two siblings who were not raised by his parents, indeed, "made it out." They are healthy, happy, and living in Mobile, Alabama. Conversely, the two siblings who, along with Mr. Williams, alternated from one house of horrors (foster care) to another (no care at all), never benefited from "positive help."

---

[5] When Mr. Williams was 17 years old, his father shot himself to death in Mr. Williams's presence. *See* PSR ¶ 51. He was 47 years old. *Id.* Two years ago, Mr. Williams's mother died from complications related to alcohol abuse. *See* PSR ¶ 52. She was 50 years old. *Id.* In itself, the early deaths of a defendant's parents (even deaths that do not involve the suicide of a parent in the presence of that defendant) may be considered favorably in the sentencing determination. *See, e.g., United States v. Collington,* 461 F.3d 805, 809 (6th Cir. 2009).

B. The defendant's mother during her Fort Myers years

Marian Williams was the illegitimate child of a married alcoholic – Pearl Brown. *See* Exhibit B at 1. Until age 4, Marian had structure in her life. *Id.* at 1. However, when her mother's husband died, Marian lost the only disciplinarian in her life and "things greatly changed." *Id.* Consumed by addiction and suffering from poor health, Marian's mother "allowed Marian to pretty much do what she wanted to during that time." *Id.* Beginning in her teenage years, things began to unravel rapidly for Marian. *Id.* "Her biological dad was present, but he helped enable her to have her way in the wrong things. When he got older, it was hard to undo what he and our mom had allowed [Marian] to start by the time she was 16 or 17 years old." *Id.*[6] Ms. Williams continues:

> I believe it had gotten really bad around 1985, [when Marian] was about 17 or 18 years old. She was fully addicted to crack cocaine. She was barely staying with our mom at home. Marian would disappear for days and no one would see her, but we knew she would come back when she ran out of money and was tired and hungry. We would make sure she was fed, got cleaned up, and she would sleep for days it seemed until she would leave again and do the same thing[.]

*Id.*

After reaching the age of majority, Marian had the right to walk out of the numerous, in-patient, rehabilitation programs that Ms. Johnson had set up for her. *Id.* And she did. *Id.* The poison of street drugs that Marian constantly consumed took "an ugly toll on her body[,]" but no one in Marian's family could convince her to remain in treatment. *Id.* at 2.

---

[6] Ms. Johnson advises that she "can best tell this part of Marian's life" because she was the primary caregiver of their mother who was in failing health during Marian's teen years. *Id.* at 1. As Marian was still living with their mother at that time, Ms. Johnson has personal knowledge of Marian's early decline. *Id.*

4

In the mid-1980s, and when Ms. Johnson already had three children of her own, she took Marian into her apartment in the East Fort Myers complex of Brookside Village. *Id.* However, after only about one month of abstinence and obedience to Ms. Johnson's household rules, Marian moved out after failing in her sole duty to simply mind Ms. Johnson's children while Ms. Johnson was at work. *Id.* Specifically, and while ostensibly under Marian's care, Ms. Johnson's children (a 12-year-old son, a 10-year-old son and a six-year-old daughter) left Ms. Johnson's house by jumping from a second-story window, crossed a highway and took up in an abandoned apartment. *Id.*

No longer residing with any family member, Marian was using crack cocaine and committing prostitution to maintain her addiction. *Id.* Following information obtained from a stranger who visited Ms. Johnson's home, Ms. Johnson's husband went to look for Marian in crack houses. *Id.* According to Ms. Johnson:

> He went along into a crack house and found my baby sister crumbled in a corner, unconscious. Bernard [Ms. Johnson's husband] carried Marian like a baby to the car and drove her to the emergency room. She had broken ribs, her jaw was broken on both sides, and she was highly malnourished and dehydrated. She had to stay in the hospital for a few days.

*Id.*

Sadly typical with an overwhelming cohort of drug addicts, the period of wholesome convalescence that follows a near-death episode is brief. In this instance, Marian initially moved back in with Ms. Johnson and her family following her hospitalization. *Id.* Marian "met a very nice young man by the name of Jerry Sanders." *Id.* After becoming pregnant, however, Marian ended her relationship with Mr. Sanders and moved out of Ms. Johnson's home. *Id.* Ultimately, Marian gave birth to her first child – Siyrra [pronounced "Sierra"] – in March of 1987. *Id.* at 3. Siyrra was born addicted to crack and asthmatic. *Id.* Marian had been "dropped off" at the hospital following her decision to walk out of the pregnant women's shelter where Ms. Johnson

had previously placed her. *Id.*[7] Ultimately, Florida authorities gave temporary custody of Siyrra to Pearl Brown (Marian's mother) "to keep her [Siyrra] *out of the foster care system.*" *Id.* (emphasis added). This determination followed Marian's decision to live with her mother, but to habitually abandon her infant, leaving her infirm mother to be awakened by a crying infant. *Id.*[8]

Ten months later, Marian gave birth to her second child – a daughter named Pearl. *Id.* Remarkably, the circumstances of Pearl's birth were even more tumultuous and dismal than that of her older sister:

> This time someone carried [Marian] to our front door while she was in labor, up two flights of stairs. We don't know who the dad was, other than the person said it was the same person who beat her up and left her in the crack house a while back. Bernard called an ambulance and went with her to the hospital. On January 16, 1988, she gaive [sic] birth to her 2nd daughter, Pearl. Bernard left the hospital when she had given birth and was placed in a room. I remember getting a call at my job on Monday (Marian had given birth on a Saturday)[.] [T]he call came from someone at DHR. [T]hey stated that my mom told them to call me at work, she gave them my number. The lady from DHR, I believe her name was Sherri George, said that Marian had abandoned her newborn baby at the hospital early on Sunday morning, and that the hospital did not know where she went. *In order for them to not place the baby in foster care,* they called a family member to intervene, and see if they would take the child. Of course, without thinking it through, and without talking to my husband, I got into my car and went to the hospital and brought Pearl home with me.

*Id.* (emphasis added).

As time passed, Ms. Johnson's mother and Siyrra had to move into Ms. Johnson's two-bedroom apartment. *Id.* Ms. Johnson's mother's health had declined and she needed assistance to care for herself, let alone care for the infant Siyrra. *Id.* "Our 3 children were in one bedroom, and my mom and babies were in our bedroom, we had 2 full size cribs in there! Bernard slept on

---

[7] When Marian was four months pregnant, Ms. Johnson enrolled Marian at the shelter. *Id.* When Marian was seven months pregnant, she left the shelter without providing notice to anyone at the shelter. *Id.*

[8] Ms. Johnson's family routinely took Marian in for a meal or a bath or for clean clothes. *See* Exhibit B at 1-2. The family would not give Marian money, however, which became a source of contention. *Id.* Ms. Johnson, on occasion, would directly pay bills for Marian. *Id.* at 5.

the couch, and I slept in the bed with my mom to take care of her and the babies." *Id.*

Two days after Siyrra turned two years old, Ms. Johnson's mother died. *Id.* at 4. Prior to this, Ms. Johnson's mother not only asked Ms. Johnson to raise Siyrra and Pearl following her death, but "made sure that DHR was aware of her decision to give me temporarily custody of both babies[.] [W]e both wanted to leave the door open for Marian to one day step into her role as their mom." *Id.*

Neither Siyrra nor Pearl endured foster care.

C. <u>The defendant's mother moves to St. Petersburg</u>

Five years passed.

In 1994, Ms. Johnson and her family moved to Jacksonville, Alabama. *Id.* During this period, Marian had moved from Fort Myers to the St. Petersburg area. *Id.* While Ms. Johnson and her family were residing in Fort Myers, "[w]e did not see her [Marian] much at all. She never came by to visit the babies, nor did she inquire about them." *Id.* According to Ms. Johnson, "[w]e embraced Siyrra and Pearl as our very own, two precious gifts from God[.] [W]e left the door open for Marian to come for them at any time, and she never did." *Id.* Today, Siyrra and Pearl are in their thirties, and continue to reside where Ms. Johnson moved them -- in the area of Mobile, Alabama. *Id.* at 6; PSR ¶ 53.

Solomon Williams was four years old when Ms. Johnson moved her family to Alabama. *See* PSR at 2. And two years prior to Mr. Johnson's move to Alabama, Marian gave birth to her third daughter and Mr. Williams's half-sister – Brianna Brown. *Id,* see Exhibit B at 4. Ms. Johnson does not know the identity of Brianna's father. *See* Exhibit B at 4. Brianna Brown and her two younger brothers struggled for basic necessities. *See* PSR ¶ 55. Ultimately, – as was Ms. Johnson's biggest fear when it came to the well-being of Siyrra and Pearl -- Brianna landed

7

in foster care as did Mr. Williams and his brother, Sebastian. *See* PSR ¶ 56.[9]

Before and after foster care, life in the St. Petersburg area with a mother who had – literally – walked out of a hospital without her newborn daughter was as dreadful as any reasonable observer would anticipate. Quoting Paragraph 56 of the PSR:

> Williams stated he was placed in foster care from ages nine to 14 due to his mother being arrested for Possession of Cocaine and Driving Under the Influence. Court records verify the defendant's mother was convicted of Possession of Cocaine and Driving Under the Influence in 2001. Williams advised he resided in approximately four different foster homes during this time where he suffered from emotional abuse, malnourishment, and would get into fights with other foster children. The defendant reported two of his sisters went to live with a maternal aunt and one sister went to live in a separate foster home. Williams stated he and his brother lived in the same foster home sporadically.

Marian married Sebastian Keith Williams [hereinafter, "Keith"] – father of the defendant and the defendant's brother. *See* PSR ¶ 51. Ms. Johnson did not know Keith but believed that he and Marian "fed on each other's addictions." *See* Exhibit B at 5. "As our sister Sharon so eloquently put it, Keith and Marian were like gasoline and a lit match, which consumed their children, Brianna, Solomon and Sebastian[.] [T]hey suffered greatly." *Id.* Mr. Williams's brother writes:

> Me 'Sebastian,' my brother 'Solomon' and my sister 'Brianna' had it bad growing up under a ruff [sic] where our mother had a serious alcoholic problem and our father was a crack addict. There were times when we were just 6, 7 and 8 years old our mother and father would be out all night drinken [sic] liquor and smoken [sic] crack, then come home and keep us up all night because they were fighting with each other in front of us.
>
> Exhibit A at 1.

---

[9] "Another time my mother got arrest [sic] for being to [sic] drunk and us three was sent to foster care for a couple of months." *See* Exhibit A at 1. According to Ms. Johnson, Sebastian Williams pursued the theme of abandonment in letters he wrote her from prison. At page 5 of Exhibit B, Ms. Johnson writes: "Later in life as I wrote to Sebastian in prison he would ask me[,] 'Auntee, why didn't you get me, Brianna and Solomon, too.' Fighting back tears now as I did then, I had to tell him he was not born when I got his sisters, and I was in another state; I apologized to him. I tried to tell him his mom was young and drugs and alcohol were key factors in her not being a better mom. I felt my sister was not capable of giving them a stable and healthy living environment to flourish in."

8

Keith was imprisoned on eight occasions. *See* PSR ¶ 55. He was last released from FDOC when the defendant was 16 years old -- on June 14, 2007. *Id.* Later that year, Keith killed himself. *Id.* at 51. "The defendant stated he and his father got into an argument in the defendant's bedroom and his father shot himself in the chest in front of the defendant. Williams advised his father died in his arms." *Id.* Each of the authors of the exhibits annexed hereto independently confirm the horrifying circumstances of the suicide. *See* Exhibit B at 5.[10] Mr. Williams's brother, Sebastian, writes:

> I know for Solomon it was hard witnessing our father kill himself [11] then dieing [sic] in Solomon's arms. That along [sic] will have a huge impact on a young kid [sic] life. Then nine years later our mother die because of her drinking and drug problem. I really believe Solomon was going to end up like our father being a drug user.

Exhibit A at 1.

Regarding the death of Marian two years ago and at age 50, Mr. Williams not only paid for the cremation of his mother, but, on the day of her funeral services, travelled from Fort Myers to the panhandle in the early morning hours to pick up his incarcerated brother, returned to Fort Myers for the services with his brother and then, after the services for their mother, drove his brother back to prison. *See* PSR ¶¶ 52, 54. It is respectfully submitted that – if nothing else – this specific gesture of affection extended on the same day as his mother's funeral speaks volumes to Mr. Williams's good character.[12]

---

[10] Mr. Williams told Officer Stevens that as recently as April 2018 he has had suicidal thoughts since witnessing his father's suicide. *See* PSR ¶ 67. He "reported he does not have current suicidal ideation and wants to live for his daughter." *Id.; see also* Part 1(D), *infra*.

[11] Also in "Exhibit A," Mr. Williams's brother writes: "My father use [sic] to be very abusive toward all of us but mainly toward Solomon because Solomon was a reflection of him." It is respectfully submitted that intentionally shooting oneself in the presence of a minor is – at minimum – "very abusive."

[12] Unselfish, good deeds are a component of the defendant's history and characteristics the Court may consider in mitigation of sentence. *See, e.g., United States v. Adelson,* 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006); *see also United States v. Vrdolyak,* 593 F.3d 676, 689 (7th Cir. 2010) (Hamilton, J., dissenting). It is respectfully submitted that the funeral services of one's mother bestraddled by a round-trip automobile trip of no less than 16 hours to ensure the attendance of one's incarcerated brother is a tireless and heroic act of love and compassion.

D. <u>Poor mental health and substance abuse</u>

> [Substance use] disorders are highly disabling, frequently co-occur with and even exacerbate other mental and physical health problems, and show a strong familial pattern. For example, in studies of community samples, children of substance abusing parents are more than twice as likely to have an alcohol and/or drug use disorder themselves by young adulthood as compared to their peers. Moreover, children of substance abusing parents are at risk for a wide variety of negative outcomes, including emotional, social and behavioral adjustment problems as well as challenges in cognitive and academic functioning.
>
> Solis, et al, *Understanding the Diverse Needs of Children Whose Parents Abuse Substances,* Curr. Drug Abuse Rev., June 2012, 135. (online at www.ncbi.nlm.nim.gov/pmc/articles/PMC3676900/)

Just as there are consequences for Mr. Williams's law breaking, there were consequences for the abuse Mr. Williams suffered at the hands of his mother, his father and his foster parents.

Mr. Williams advised Officer Stevens that he had been housed at Salus Care in Fort Myers under the Baker Act. *See* PSR ¶ 65. While held under this Court's Order of detention, mental-health professionals at the Charlotte County Jail diagnosed Mr. Williams as suffering, among other things, chronic post-traumatic stress disorder. *See* PSR ¶ 66. A review of Mr. Williams's file with the Florida Department of Children and Families not only provides ample support for that diagnosis and previous commitment, but corroborates the allegations of familial substance abuse, domestic violence,[13] child neglect,[14] and repeated contacts with law-enforcement agencies:

---

[13] Exposure to domestic violence, either as a victim or as an observer, is a component of an otherwise troubled upbringing and a factor that may be considered favorably in the sentencing determination. *See United States v. Lopez,* 938 F.2d 1293, 1298 (D.C. Cir. 1991) (pre-*Booker*).

[14] Parental abandonment – to include the profound emotional damage caused by the abandonment as well as the lack of any adult guidance during adolescence that is the necessary result of such abandonment – are factors that may be considered favorably in the sentencing determination. *Collington, supra,* at 808-09; *United States v. Williams,* 436 F.3d 767, 768-69 (7th Cir. 2006); *see also United States v. Bendtzen,* 542 F.3d 722, 728 (9th Cir. 2008) ("extreme childhood abuse" considered as a factor supporting downward variance). *Cf. United States v. Zelaya,* 908 F.3d 920, 930 (4th Cir. 2018) *cert. denied* 139 S.Ct. 1581 (2019) ("difficult childhood" considered as a factor supporting downward variance); *United States v. Deigert,* 916 F.2d 916, 918, 919 (4th Cir. 1990) (pre-*Booker*).

| July 19, 1997 | Brianna [8] Solomon [6] and Sebastian [4] alone at residence for over six hours. Police present at residence when Marian returns home inebriated. |
|---|---|
| November 30, 1998 | Police respond to domestic violence call. All children present. Marian refused to give Keith a cigarette, then Keith slapped Marian. |
| June 20, 2000 | Children left alone at residence for over four hours. "Although the oldest child is 11 years old, she is emotionally handicapped and it attending special classes for a learning disability." Also noted in report: "Marian Williams has been beating her children with her hand or a belt. The beating continues for 10 to 15 minutes and the sound of skin being hit can be heard down the street." |
| April 7, 2001 | Marian arrested at a bar for trespass and possession of cocaine. Police determine Marian left her children at home to go to the bar. "Kids need placement. Parent jailed." |
| February 26, 2002 | Police respond to domestic violence call. Keith assaulted Marian after Marian refused to give Keith her purse. "Children were wakened [sic] by the noise of the argument/altercation and witnessed the incident." Also: "Solomon attempted to stop [Keith] from hurting his mother and [Keith] punched him in his left eye." |
| April 10, 2002 | Caseworker notes: "Mom was extremely intoxicated at home. She was stumbling around, slurring her speech, incoherent, could not answer simple questions. Her eyes were dilated. She may have been on something other than alcohol." |
| August 12, 2002 | Police respond to domestic violence call. "Mom called the police and told [Solomon] to rub his eyes and tell that his dad punched him." Marian admits to police "she had made up the story about domestic violence because she was mad at her husband for taking money out of her purse and not giving it back." |
| October 28, 2003 | Police respond to domestic violence call. Investigation reveals phone had been ripped out of the wall and that all three children jumped into a physical confrontation between Marian and Keith to protect their mother. |

Statistically, about 20 percent of all individuals afflicted with PTSD[15] self-medicate with alcohol and/or street drugs and/or misused prescription medication. Leeies, et al, *The Use of Alcohol and Drugs to Self-Medicate Symptoms of Posttraumatic Stress Disorder,* <u>Depression and Anxiety</u> 731-36 (Aug. 27, 2010).[16] According to the Anxiety and Depression Association of America, "[m]entally reliving a traumatic event can be almost as stressful and frightening to people suffering with PTSD as the original event." *See* ADAA, *Posttraumatic Stress Disorder,* at 3 (2018) (online at https://adaa.org/sites/default/files/ADAA_PTSD.pdf).

Solomon Williams first consumed alcohol when he was 10, first used marijuana at age 13[17] and first used heroin at age 17. *See* PSR ¶¶ 68-70. Prior to his arrest, Mr. Williams's dependency on illicit substance grew to one-quarter of an ounce of marijuana and three grams daily.[18] *Id.* "Williams reported after his father committed suicide he sold drugs to support his habit." *See* PSR ¶ 70. At PSR ¶ 17, Officer Stevens reports:

> Williams stated he is remorseful for having sold drugs. The defendant advised he became involved in this case for financial gain to support his own drug addiction and his family financially due to his sporadic employment.

---

[15] PTSD is an anxiety disorder. *See* DSM V 309.81, pp. 274-280. "The importance of re-experiencing cannot be underestimated, for it is the likely source of the other categories of symptoms [here, numbing of responsiveness to stimuli associated with the event and symptoms of increased arousal]. In fact, some of the theories of PTSD make this a central feature by attributing the disorder to an inability to successfully integrate the traumatic event into an existing schema (the person's general beliefs about the world)." Davidson, Neale, *Abnormal Psychology* at 158-59 (Wiley & Sons, 6th Ed. Rev., 1996). It is frightening to contemplate the contours of a child's "general beliefs about the world" when those beliefs are the product of the wretched home life detailed in the summary of DCF records appearing on page 11, *supra*.

[16] Online at https://onlinelibrary.wiley.com/doi/full/10.1002/da.20677 (last viewed June 26, 2019).

[17] Comparing this self-reporting to the summary of the DCF records presented *supra*, Mr. Williams began to drink and smoke marijuana contemporaneous with the abuse he suffered in his childhood home.

[18] Respectfully, a three-gram-a-day habit is a lot of heroin. At www.justice.gov/archive/ndic/pubs5/5169/heroin.htm (last visited on June 26, 2019), the Department of Justice reported a gram of heroin sold for between $60 to $120 per gram in southern Florida in 2002. From January 2016 through December 2016, the price of a gram of heroin averaged from $855 to $902, nationwide. *See* U.S. Department of Justice, Drug Enforcement Administration, *2018 National Drug Threat Assessment,* at 12 (October 2018).

The substance that initially provided some relief to a condition diagnosed by mental-health professionals at the Charlotte County Jail had led to the ruin of Mr. Williams. Along with the other 23 percent of individuals who become heroin addicts after at least one use,[19] Mr. Williams's addiction propelled the criminal acts for which he shall be sentenced. Unlike at least some of the unfortunate 23 percent, however, Mr. Williams's heroin and marijuana abuse followed years of child abuse inside and outside of his familial residence and propelled a self-destructive process originally started to merely reduce terrible and near-constant anxiety.

2. **Because Mr. Solomon's previous terms of incarceration have been local terms at the Lee County Jail totaling 15 days, the term of incarceration imposed for the instant offenses will be of greater significance**

Part 1 of this memorandum either introduces or explores discrete facets of Mr. Williams's life history that, respectfully, suggest a sentence below the advisory guideline range.

It is respectfully submitted that whatever sentence the Court ultimately imposes in this matter will be more significant to Mr. Williams because Ms. Solomon has never spent a day incarcerated in a federal facility and at a distance far removed from his wife and child. The Court may consider this unique impact on Mr. Williams when fashioning a sentence that reflects the need for just punishment[20] and adequate deterrence.[21] *United States v. Baker,* 445 F.3d 987, 992 (7th Cir. 2006); *United States v. Burghardt,* 796 F.Supp.2d 996, 1004 (D.Neb. 2011); *see also United States v. Collington,* 461 F.3d 805, 808 (6th Cir. 2006); *United States v. Qualls,* 373 F.Supp.2d 873, 877 (E.D.Wis. 2005).

---

[19] *See* National Institute of Drug Abuse www.drugabuse.gov/publications/drugfacts/heroin (June 2018) (last visited on June 26, 2019) and www.therecoveryvillage.com/heroin-addiction/faq/addicted-first-time/#gref (last visited on June 26, 2019).

[20] 18 U.S.C. § 3553(a)(2)(A).

[21] 18 U.S.C. § 3553(a)(2)(B).

### 3. Conclusion

The only children of Marian Brown to remain outside the criminal-justice system were the children taken away by the State of Florida.

The only children of Marian Brown to remain outside the criminal-justice system were the children that Marian's family successfully struggled to keep out of foster care.  *See* Page 6, *supra* (Ms. Johnson's insistence that Siyrra and Pearl remain within the family and outside foster care).

Ms. Johnson brings her forthright, heartfelt letter to a close with the following observation:

> Sebastian now in prison; Solomon with a pending future there, and Brianna with serious medical issues.  I believe there is hope for Brianna, Solomon and Sebastian[.]  I believe we should take into account their mother's issues, coupled with their dad's issues[.]  [H]e committed suicide in front of his son, Solomon.  We should ask this question seriously 'were these 3 children really given a chance to become God fearing, positive, productive citizens of society[?]

Exhibit B at 5.

For reasons that follows, it is respectfully submitted the answer to Ms. Johnson's question must be in the negative.

The fourth child of a mother who never bothered to hold her second child, perhaps the victimization of Mr. Williams pinnacled when his father waited for him to get out of the shower before shooting himself in the chest with a .44 magnum.  If not at that moment, then perhaps the victimization pinnacled when Mr. Williams was left to remove the particulates of his father's shredded, thoracic organs from the walls, the carpeting and the furniture of his bedroom after the coroner's departure.

Whether there ever was a pinnacle to Mr. Williams's pain, there remains at least one certainty: that is, if Mr. Williams ever benefitted from adult supervision, that adult was neither his mother nor his father.  To the contrary, Mr. Williams's parents succeeded only in creating a nightmare of neglect and violence.  The abuse Mr. Williams suffered -- respectfully – defies

quantification, and the expectations for any child emotionally mangled by the diseased environment documented herein are, at best, surely meager.

Mr. Williams respectfully asks this Court to take into account his personal characteristics and history in imposing a fair and reasonable sentence, sufficient but not greater than necessary to achieve the goals of sentencing. *United States v. Talley,* 431 F.3d 784, 786 (11th Cir. 2005). For the reasons appearing in this memorandum and in the PSR, and for the reasons to be presented at the forthcoming sentencing hearing, Mr. Williams respectfully seeks a downward variance. Specifically, Mr. Williams asks the Court to consider downward variance on the advisory term of incarceration and to sentence Mr. Williams to a term of sixty (60) months, to be followed by a term of supervised release of no less than three years.

Respectfully submitted,

Donna Lee Elm
Federal Defender

/s/ James Lappan
James Lappan
Florida Bar No. 0160792
Assistant Federal Defender
1514 Broadway
Fort Myers, Florida 33901
Telephone: 239-334-0397
Fax: 239-334-4109

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this the 28th day of June 2019, a true copy of the foregoing was electronically filed and served electronically to Chas Schmitz, Office of the United States Attorney, 2110 First Street, Fort Myers, Florida.

/s/ James Lappan
James Lappan